Okay. Ready, Ms. Harrison? Be glad to hear from you. Welcome to the South Carolina Lawyers. Thank you, Your Honor. And I'd like to say this has always been the most hospitable court to appear in, and your staff at the clerk's office has gone way beyond the call of duty in helping my client who has needed special accommodations, and we really appreciate that. You're very proud of it. May it please the Court, this has been one of the greatest privileges of my legal career to represent these two gentlemen who come to this Court as private attorney generals. One, Coby, after suffering tremendous indignities for years, and that's one of the things that the lower court missed, the horrific violation of the civil rights of Coby when he was treated as if he had what was then called mental retardation for years, when he was a very bright, charming, funny individual. And because of the actions that were taken by the government, even after the ombudsman came in and investigated him being left lying in waste and left in bed for days and sometimes weeks at a time when his wheelchair didn't work, the agency still didn't get him a speech device so he could share what's happening to him to protect himself and to receive the services that he needs. Your Honors, I will begin by dealing with the sovereign immunity issue. It's kind of and the members of the Budget and Control Board and the Governor say that sovereign immunity applies because for years, this Court and the Supreme Court have said that under Ex parte Young, any prospective relief certainly was abrogated by the passage of the ADA. We Hospital, a 1990 case that came from this Court up to the U.S. Supreme Court, where the Governor was sued for violation of the Medicaid Act. We have Constantine. We have Antrocan. There are so many cases where that just is not the issue. In Wright v. North Carolina, we have this Court said there's less robust protection for State officials than for the State. The Federation of the Blind, this Court did an excellent review of the ADA and what it requires States to do. And then, of course, U.S. v. Georgia, which we were asked, which somehow neither side cited in their briefs, but in our supplemental case, shows that there was an intent to abrogate sovereign immunity under the 14th Amendment. There can't be any question that Coby's 14th Amendment rights were violated. I mean, he was, his liberty was taken. The difference between Coby and the prisoner in U.S. v. Georgia is that there was no parole date. Until he got this device, he had a lifelong sentence. There was no review. There's no entity that reviews people like him and the services that are being provided. Protection and Advocacy in South Carolina, they've been trying to get regulations established since 2007. That case was recently sent back to the Circuit Court after it was dismissed. There's a case pending in the Supreme Court with Protection and Advocacy being denied records. So people Why aren't Mr. Coby's claims moot now that he has the replacement wheelchair and adult care services? Why aren't his claims moot? Well, his claims aren't moot, Your Honor, because he still is living in a congregate setting, which under Pashby, this Court has said is an institutional setting. And the Americans with Disabilities Act says that that is discrimination. He lives in a home with three men who are mentally challenged. He is not. His schedule is set for him. He goes where they go. He doesn't have the freedoms that this Court said in Pashby he's entitled to have. What happened? And so that issue, the defendants say he never asked, but we've got affidavits. We've even got the plan of care from 2000 and I think 2012 and 2013 showing that in his plan of care there was a request to provide services. I believe it was 521-12 plan of care. He requested and when I come back up I'll have the page number for that. It was included in the plan of care. And what this Court said in Pashby and what the South Carolina Court of Appeals said in Stonstall was that you can't deny services based strictly on cost. And that's exactly what they did with the supplemental authority they provided this Court last week. There's no reason other than cost. And we've also shown when we look at the congruence and proportionality test that the services would cost less. When the State imposed these caps on services, the cost, the average cost per participant went from $37,000 a year to $51,000 a year. It costs more when we cap services at home than at home. The total cost of the program went up by $50 million. And the Court of Appeals, the South Carolina Court of Appeals acknowledged the only reason they used for capping these services is cost. Well, why shouldn't that case take care of it? Why hasn't there been in the two years since that case was decided another assessment? There's no standards. And we have shown that their policy is that we don't pay any attention to physician's orders. So there's no, the Medicaid Act says there have to be reasonable standards. Stonstall still hasn't received an assessment of the personal care services. And he won that case two years ago. So as we discussed in our brief, what's happened is he won on the ADA issue, but because the Medicaid Act issue was not resolved, the reasonable promptness issue, this Court said in 2007 in what I believe Judge Wynn referred to as a seismic decision that services have to be provided with reasonable promptness or they have to deny it within reasonable promptness and give us a right to a hearing where a decision is rendered within 90 days. And on the question of mootness, aren't you alleging that that reflects the need for continuing federal supervision, so to speak? Absolutely. The fact that these services or the assistance he's entitled to has not been historically provided with reasonable promptness. And the speech device, they'll quit, next year they'll quit servicing that, the manufacturer. So it's not like a car wreck where you wreck my car and so you buy me a new car and then I go my way and you go your way. These people need continuing care. And so he still has not been provided speech services that he needs to have to learn to use the device. He still has, he'll need another one next year. The wheelchair, it took years to get. They say they didn't know about it, but we've got emails in there where I invited Mr. Keck, the head of HHS, to come to his meeting in 2011 and told counsel about a dangerous situation when Kobe was taken to the emergency room because he couldn't roll over and tell staff that he needed help. So these are ongoing violations. And the other thing, Judge Thacker, that's really important here is that in spite of the extreme retaliation that my people in South Carolina have experienced, he comes as a private attorney general. We've shown that through this device, this man can speak, he's getting a job, they're hiring him to review videotapes at the day program where he attends. He is one of hundreds of people like him who are locked in a body with their life and liberty. They're being kept in dangerous places like the Babcock Center. And what they need is a speech device. So he brings this case under the Piggy Park Private Attorney General theory, not only for himself, but for others. I'd like to talk about the ADA issues. Everyone agrees that Mark and Kobe are disabled people. That's not a question. The additional, the services he needs are in his plan of care, which was done, I'll have that page number when I come back up, which was done by a service coordinator. We've shown, they gave a number that it would cost $440 a day, I believe. We have an affidavit of Bill Barfield, who is a former finance director for DDSN, that shows that they pay, they're people whose services cost $500 a day. Kobe is one of the most disabled people. You know, the average before the cuts was $37,000. The average after the cuts was $51,000. So he is on the high end. But if he's in an institution, he'll also be on the high end there, because his needs are so great. So we believe that under the ADA standards, there's no fundamental alteration in providing him the services in a less restrictive setting. This Court has said that a group home is an institution. We've got a transcript that says that, where the HHS person says that. The they failed to prove there would be a fundamental alteration by doing away with these caps. They failed to show here. What we've shown is that it costs more when they put these caps on services. As to the anti-retaliation issue, Your Honors, Kobe's been retaliated against unless they're going to say, well, we take years to get a wheelchair for everybody. I mean, if that's the issue, that's another even more serious issue. What's the protected activity that you're alleging in this case? Bringing this lawsuit. And we have affidavits in the record where Lennie Mullis, her certification was terminated, and she had to go through the appeals process. And I've got just a few issues about Wessler and the access to the courts. In South Carolina, the fair hearing procedure that's supposed to take 90 days takes years. Years. And you can't get to the judicial branch until you go through that process. And my time's running out. So if you look at the Brooke Waddell case, she filed her administrative appeal in 2007. It is that 2007 appeal is still pending in the administrative branch. These cases go from HHS to the ALJ, back to HHS, back to the ALJ. And the ALJ is an executive branch entity in South Carolina. So we would argue that even under the access to courts issue, this case raises that issue, that there's no access to the courts because they're forcing us to go through that administrative procedure. Coby, it took more than 90 days. He got out of the, he got out of that process, as this case, but we have the case coming up still in December, where... Ms. Harrison, you're way over your time. Oh. That's what that red line is. Oh, I'm sorry. That's all right. You've got some more time after they finish arguing. I apologize. That's okay. Mr. Wood-Zarek, Wood-Arzik. I'm sorry. Sorry, Your Honor. Damon Wood-Arzik. Okay. On behalf of the health care agency defendants, Your Honor, I'll be taking 10 minutes of the rulings on rightness, mootness, and standing. Mr. Vance Vettis, who's at the table with us, represents the Budget and Control Board defendants, and he's prepared to argue on the 11th Amendment and legislative immunity issues. Your Honor, Ms. Harrison didn't address the issue of the adult day health care issues at all in oral arguments. So I'll briefly touch on that. The issue, obviously, is moot because while there was a decision that they were no longer eligible, Kobe's decision was almost immediately reversed by the Department of Disabilities and Special Needs, and Mark's issue was resolved through the administrative process. How do we know that the state won't change its policy adversely the day after we decide this case if we agree with you on mootness grounds? Because it makes no difference in this particular case with these two particular plaintiffs. While the two requirements that made them ineligible, the medical complexity condition and the extensive assistance with services requirement, have been removed, there are two consent orders signed by both counsel, approved by the fair hearing officer, stating that they qualify for the services and they can receive the services by the provider of their choice. So if the agency would change its mind after this ruling, they'd be in violation of those rules, and they'd be enforceable through the APA, through the Administrative Law Court, the Court of Appeals, and the Supreme Court of South Carolina. So that's the difference in this particular case about the voluntary mootness versus the situation that occurred in Pashby, is that there are two orders binding the agency to maintain these services at the provider of the choice. And unless there's any further questions about the adult day health care, I'll move on to the wheelchair issue. You know, I think we have a fundamental difference of what a request for services is under the Medicaid Act. Ms. Harrison takes the position that any time she emails or drops a letter or a phone call, that constitutes a request for services. Any time that a participant meeting with their care planner says, I would like to live in an apartment, or I would like additional this or that, that's a request for services. But what the actual Act talks about in 42 U.S.C. 1396A, is that the individual may make an application for services. And once the application is made, then the agency has to act with reasonable promptness regarding those services, if eligible. The application process for the wheelchair requires a doctor's order. The doctor says that the wheelchair is medically necessary. Then that order is sent directly to the Department of Health and Human Services, which handles all durable medical equipment. In this case, this lawsuit was filed in May of 2011, there was no order for a wheelchair. In fact, the only order for a wheelchair that arose in this case, occurred in May 14, 2013. And that's in the record at 2404. In other words, this case was pending for two full years before an order for a wheelchair was given. And I know there's allegations in the record that, well, we're mired down, we don't know what's going on, there's too many rules. Now, Coby, Mr. Lefthard, received a wheelchair in 2009. He went through this entire process before because his previous wheelchair was damaged. So he received a doctor's order, he applied to DHHS for a wheelchair in 2009. He received a wheelchair. That wheelchair was subsequently damaged through the allegations against the Babcock Center. However, in May of 2013, he gets an order. It's my understanding that that was presented to DHHS in July of 2013. And they approved the request in September 2013, within 90 days. And he has a wheelchair. When the process is followed, the equipment was provided. So, again, when it was done, the wheelchair was provided, and that issue obviously is moved. There was nothing the district court could order to correct everything. And there was no reasonable problem, just issues with that. Regarding the adult communication bias, Your Honor, the fundamental problem is DHHS was a speech therapist and his doctor saying that he needed this specific device, the Coby C12, which is an eye gaze device. The problem is that the application, which appears in the record at 1219 through 1240, the doctor says, I agree with the treatment plan of the speech therapist, and I recommend or I order this particular device. The treatment plan said, specifically, that Coby, Mr. Lephardt, needed a device to communicate basic wants and needs and medical needs. That appears at 1233. There was no request about he needs a device to increase his interaction socially, to learn, to get a job, anything along those lines. What the department had was that he needs a basic device to communicate basic needs. And what the department did, under its authority and requirements of the Medicaid Act, is to make sure that the service rendered covers the medical need. And in this particular situation, four days after the submission of the documents, the medical director of DHHS determined that a device with prerecorded messages versus a the medical needs set forth in the physician's order. And that's the difference. It was a basic determination. We don't have the money. We're not providing these to participants. And in fact in the record, it notes that these devices have been provided to other individuals with Coby's, Mr. Lephardt's disabilities, the same disabilities. So is it your position that he's gotten everything he's entitled to on a timely basis? He did not receive the device he requested because it was denied as not being the device that would meet his medical needs. There was no reapplication for a different device. There was no appeal of that decision. So a decision was timely made and it was found that he was ineligible for that device. So yes, the department did comply with the Medicaid Act in rendering a timely decision. But there was nothing to provide because it was determined that he was ineligible. And again, he has received the device. And in fact, if this court would order that the device be turned back in or voluntarily surrendered and DHHS order a device, he'd actually be ordered to provide him an inferior device because what was requested was a C-12 and now he has been awarded the C-15, which by virtue of time is more current and technologically probably superior. So granting them the relief they would want would actually put him in a worse position. The rightness issue, the court ruled that Mark's respite care request was not right. He received 240 hours a month. The only allegation in this lawsuit and it's set forth actually in the response to summary judgment is that if his sister who is his caretaker would be hospitalized for six weeks that he would face the risk of institutionalization. And clearly that is so speculative. He does not face a concrete risk which is required in order to make an issue right and therefore the court was correct in that issue. The SLP-2, the apartment requirement, he cannot live there. The record clearly shows that an SLP and SLP-2 are for people who have a high degree of ability for independent living. The record at 4323-4326 indicates that the pre-SLP qualification checklist, he did not make any of the requirements. You have to have a level of four which is independent on at least five factors. He made a four on one factor. It was determined in that request which is in the record that he cannot live in an SLP-1 or SLP-2 because he cannot maintain an independent lifestyle. It's not designed to have 24-hour care. It's not designed to have people always there. It has a caretaker that may come to assess certain needs throughout the day. You can see him, it's claimed that he has to have his arms strapped to the wheelchair. He's spastic. There's no way that he can live in an independent setting and the CTH-2 is the next least restrictive setting that he qualifies for. Your Honor, briefly on the standing issue, all of the allegations regarding institutional and individual corruption dealt with these allegations of work centers that were privately owned and that somehow they'd be transferring people who work in the ADHD or the adult day health care centers over to these private work centers to farm them out for a less amount. There was no allegations with regard to either of these individuals that they work in a work center or somehow were transferred from their adult day health care facilities and therefore the court correctly determined that they lack standing for those issues. My time has expired and I'll yield the floor. All right, thank you. Mr. Bettis. Thank you, Your Honor. I'm Vance Bettis and I'm today speaking on behalf of all the Budget Control Board defendant appellees and just a cast of characters to know who's properly before the court. Treasurer Loftus and Representative White are members of the Budget Control Board, were when the lawsuit was brought, but Ms. Harrison has not pursued an appeal against either one. That's in her brief. Former Representative Dan Cooper and former Treasurer Converse Chellis both left office in 2011 and so they are not proper parties for any kind of prospective injunctive relief. Former Governor Sanford was sued but never served. He was dismissed. There was no appeal from his dismissal. So the Budget Control Board members who are before the court in terms of any kind of prospective That's the only third. The court asked for supplemental briefing on the constitutionality of Title II and abrogation of 11th Amendment immunity and we responded. United States v. Georgia says that insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the 14th Amendment, Title II validly abrogates its sovereign immunity. Ms. Harrison in the district court conceded that she was not seeking damages against any State defendant. We quote that exchange between Ms. Harrison and Judge Seymour at page two of our supplemental brief where Ms. Harrison says, this lawsuit has to all of the defendants other than Babcock Center. Babcock Center, we also have a claim for damages. But this lawsuit, as to the 1983 claim, as to the ADA, as to the Rehabilitation Act, those claims we are requesting injunctive relief. In the district court, Ms. Harrison expressly disavowed any claim for other than prospective injunctive relief against Senator Leatherman and Mr. Ekstrom and former Treasurer Chellis. That's in the record. The reference to Senator Leatherman and Mr. Ekstrom is at Joint Appendix 2240 where she says, in reply to the response of Leatherman and Ekstrom, plaintiffs restate that the only relief they seek from these defendants is injunctive relief. That's at page JA 2240. In terms of Mr. Chellis, that is at page JA 0115 and at that point Ms. Harrison says, only prospective relief and attorney's fees are requested from this defendant. That's in her reply in opposition to Mr. Chellis' brief. So there's no individual capacity claims left. I'm sorry, I left out Cooper. She did the same thing for Cooper and that's at page 1086 of the Joint Appendix where she says, in response to his motion summary judgment, all of the relief requested by the plaintiffs as to Defendant Cooper is prospective. So there's no claim for damages in this case and as we point out, Judge Seymour did not She dismissed it for lack of standing, mootness and a rightness. Judge Cain dismissed the natural defendant Budget and Control Board members from any claim under Title II on grounds that they were not properly suable under Ex Parte Young, which would apply regardless of whether Title II abrogates Eleventh Amendment immunity because you can't just willy-nilly pick and choose and pick at the State Director and say, well, I'm going to sue four, five and six because Title II abrogates Eleventh Amendment immunity. If you're suing for injunctive relief against State officials under Title II, you have to establish the special relationship that Ex Parte Young requires, which means you have to show proximity and responsibility to the challenged actions. The challenged actions in this case are a reduction alleged in Medicaid services that adversely affects certain disabled citizens. But the Budget and Control Board has no responsibility for enforcing the Medicaid Act. It has no authority to do that. In fact, Judge Bridget Hendricks, in an opinion that we cite and was cited by Judge Cain, recognized that the Medicare law requires a single State agency to be designated. In South Carolina, there is no question that that single State agency is the South Carolina Department of Health and Human Services. It is the only agency with authority to alter Medicaid's level of services in South Carolina. The Governor doesn't have that authority. The State Treasurer doesn't have that authority. The Comptroller General doesn't have that authority. The Chairman of the Senate Finance Committee doesn't have that authority. Nor does the Chairman of the House Ways and Means Committee have that authority. So, it's a non-issue. What, to decide whether Title II validly abrogates the Eleventh Amendment under the circumstances of this case, would simply be this Court rendering an advisory opinion. There's no need to reach it. Again, Judge Seymour dismissed the claims for lack of standing, mootness, and ripeness. As to the Budget Control Board officials, they wouldn't be suable in any event under the ex parte Young analysis. So it's simply a non-issue, and when constitutional issues don't need to be decided, we all know what the rule is. They ought not be decided. A time will come when that issue has to be addressed, but it's not now. The other point I'd make is that the plaintiffs had a Rehabilitation Act claim, and we all know that Rehabilitation Act is virtually identical to Title II in terms of the relief available. It was not dismissed on Eleventh Amendment grounds. It was dismissed as to the Budget Control Board appellees on the same grounds, which is that they didn't have a special relation to the enforceability, no specific enforcement authority. But that's the very same line of reasoning this Court followed in Constantine, and they said that's the proper analysis, that under Rehabilitation Act, you can only sue a State official under ex parte Young, and to do that, you've got to show that they have that special relationship. So in our opinion, no harm, no foul. This is a non-issue, and that's the position we have advocated. With respect to the official capacity claims, like we've said, the law is clear that there's one agency in South Carolina that has enforcement authority for Medicaid, and it is not any member of the Budget Control Board. These people, by the way, Judge Faxon, I know you know this, but Judge Diaz and Judge Thacker, the people on the Budget Control Board hold office ex officio. They change as elections change. It's the Governor, the Chairman of the Senate Finance Committee, the House Ways and Means Committee Chairman, Comptroller General, and the State Treasurer. So it's not people that stay in office forever. They change with the elections, and they have no responsibility. Ms. Harrison did assert a claim against the 2009 members of the Budget Control Board, which would be Chellis, Cooper, Sanford, Ekstrom, and Leatherman. She did assert a claim that they had gotten in cahoots and voted to do this terrible thing where they authorized DDSN to spend some money from a special capital reserve fund. I would point out that she subsequently abandoned any claim by saying to the Court, as I've read to you, we are only claiming prospective injunctive relief. To the extent she tries to challenge this, what she's asking the Court to do is to say that because I believe that the Budget Control Board has no legislative authority to appropriate monies and because they exercise that authority, that you ought to hold that they were in violation of state constitutional law and separation of powers and thereby give us some money. And in that regard, what I'd like to do is read two quotes. One from Pennhurst v. Haldeman, a claim that state officials violated state law in carrying out their official responsibilities is a claim against the state that is protected by the Eleventh Amendment. Can't enjoin state officials based on a violation of state law. And from Puerto Rico v. Metcalf, ex parte young exception applies only to the prospective relief and does not permit judgments against state officers declaring that they violated federal law in the past. We think that Judge Kain correctly dismissed the claims against the Budget Control Board members and we think that the Court should affirm that judgment. Thank you, Your Honor. Thank you, Mr. Bettis. Ms. Harrison, you have some time remaining. Thank you. Your Honors, as to the dismissal of the state officials, that statement was made after they were gone. That statement referred to the DDSN officials. And one of the things that Bruce Halhendrick said in her order is that Medicaid is simply a mechanism where the federal government helps pay them to comply with the ADA. The ADA is clear that it applies to the states, not just to the agencies in Section A and then in Section B, as I mentioned in our brief, and to the agencies. So where does COBE go when HHS says, well, we don't have the money or we don't have the state is liable for violations of ADA? And that includes the governor and the governor, Haley, in her official capacity, is responsible for the sins of the former governor as to what happened with trying to get rid of the commissioners who took the information to the Legislative Audit Council, which showed that millions of dollars was being misspent, and then tried to remove them. So as to the governor, I agree there are some of the BCB members that are out, but as to the governor, and I believe Leatherman, Ekstrom, and Chellis, I don't believe, and that can be resolved on remand as to who's left. But that statement about we're seeking prospective relief, we were before the judge who has three times dismissed us on Doe v. Kidd, and those players were already dismissed. So they can't get dismissed by a statement that I make as to the remaining defendants. We have alleged a scheme whereby this excess funds account is not accountable by the General Assembly. They don't know it's out there. We have alleged a scheme where that money comes into DDSN from workshops, from the labors of mentally retarded trainees, is a word that's used. Those revenues go to DDSN, and it's not in the state budget. And then DDSN goes to the Budget and Control Board, and they split that money. The Budget and Control Board got $3.2 million that was not in the state budget that year. So I think all we have to show is that it's plausible on its face, and we've shown that with the numbers here, with the money laundering, the money going from DDSN to the Babcock Center and coming back. All of that's outside the state budget. As to the ADHD issue, we won on that. It took them longer than 90 days, but we won on that. But you're absolutely right, Judge Diaz, that they can change it tomorrow because the settlement agreement says it's subject to their re-evaluation, just like PASB, and even more so than PASB. You mean the consent order says it's subject? Says that it's subject. I can't give you the exact words, but under Medicaid, you're always subject to re-evaluation. And there's language in there that would allow them to do that. And what we have seen, and stod still, is that the Court of Appeals said that we throw out the Medicaid Act, we throw out the regulation CMS has made, if CMS approves a waiver. And this is frightening. The Joseph case that came out just two weeks ago agreed with that. If the regional office at CMS agrees to a waiver, then the Medicaid Act doesn't apply. So what we have here, in PASB we had a situation where the General Assembly passed a law. What we have here is that this was done in the dark after the General Assembly adjourned and it was put into place before they came back. The General Assembly has never reviewed these caps. And now we have the Court of Appeals and stod still saying that, I mean, they actually say that CMS's approval of a waiver document carries the force and effect of law, completely opposite of this Court's decision in WSS. So that they can change that at any time. It also ignores the fact that they brought this as private attorney generals. Rosa Parks didn't go through that lawsuit just to get herself on the bus. Coby and Mark brought this as private attorney generals. So even if that was true, that leaves these other people out. The application, that's a reasonable standards issue. There is no application. There is no way. We are told you have to go through your service coordinator. That is what we did. They pay a service coordinator. We did that. We followed their process. And then this many years down the road, they said, well, you didn't fill out an application. There is no application. There are no reasonable standards. There are no regulations. And since 2007, DDSN has said, we don't have to promulgate regulations. So whatever rules they have, they can change them whenever they want to. So what do we have to do to tell him he needs a speech device? We told the service coordinator. We filed the lawsuit. The ombudsman said he needed one. We got doctor's orders. We had to get doctor's orders over and over for the speech device, so that that's part of the problem. There is no process. There are no reasonable standards, which Section 17 of 1396AA requires. They don't consider physician's orders. That's in the record. The speech evaluation, they denied it because he's not engaged in educational endeavors. Well, this man had been asking to learn to read for years, and they wouldn't let him learn to read because he didn't have a speech device. And then they denied the speech device because he wasn't engaged in educational endeavors. So what I would suggest is that this Court, because they won't establish reasonable standards, the Social Security Act has the treating physician standard that's tried and true, and until they adopt their own standards, that could be applied. I thank you. If there's no more questions. Thank you, Ms. Harrison. And I'll ask the clerk to adjourn the Court, and then we'll come down and recount.
judges: William B. Traxler Jr., Albert Diaz, Stephanie D. Thacker